The next matter, No. 25-1383, In Re. Apellis Pharm. Inc. Securities Litigation. At this time, would Counsel for the Appellants please introduce himself on the record to begin? Good morning, Your Honors. May it please the Court, Andrew Love for the Appellants. I'd like to reserve three minutes for rebuttal. You may. The complaint alleges that defendants misled investors by stating over a dozen times that the clinical trials for the company's leading drug candidate, Sifovre, had no reported cases of retinal vasculitis, which was a serious side effect that investors were keenly aware of. These statements were misleading half-truths, because in making these statements, defendants omitted to state that their trial protocols were not designed to detect vasculitis. Defendants repeatedly singled out vasculitis as a side effect not reported because of what happened in another case, B. of U., in which investors were very much aware that when retinal vasculitis was reported in those cases, it was devastating for that drug's marketability. I was confused by the briefs, because it appeared that, in fact, the protocol called for three testings, and that was done. Yes. But you're alleging that it was misleading because it implied there was no detections when there was no testing. There was testing. And they used the same test that you say they should have used. They just didn't use it apparently as often as you say they should have used it. Right. So Fluorescein Angiography, or FA, is the test for vasculitis, and it was used on the onset, and after one year, and after two years. There was no indication at all that it was being used to detect vasculitis. Well, what does that mean? Can it be done without testing for vasculitis? Can you do FA, and if it's a positive vasculitis, am I not going to see that? You would see it, but as we allege from our expert from the American Society of Retinal Specialists, from Dr. Heyer, that that's not enough. If they really wanted to detect vasculitis, they would have... So it's all about timing. It's not the test. They did the right test, but your position is they needed to do the test immediately after inflammation was identified. Yes. That the test wasn't designed to detect vasculitis because it's not mentioned in the protocol. There's another condition, CNV, which the protocol does call for using FA on the appearance of those symptoms. But if you just told me that if you do FA, you're going to see it, and they did FA, then the problem would have to be, if all that's true, then they didn't do FA at the right time. And the right time, I guess, based on your expert, would have been immediately after inflammation. So they would detect FA, the symptoms of FA, if vasculitis happened to be present when that test was taken. So by happenstance, sure, they may have captured some cases. But our allegations are it wouldn't have been detected effectively. It wouldn't have been detected based on not just our expert, but Dr. So if you get vasculitis, what happened to you as a study participant? Did you stay in the study, or did you leave the study? If you got vasculitis? If you had inflammation from the treatment. Inflammation, you would stay in the study, and there was plenty of cases of inflammation. But there was no testing of, and given that inflammation is the key symptom for vasculitis, there was no testing of those patients once they had inflammation to test for vasculitis. Well, I thought there was a test midstream. They tested it after one year, but there are... Okay, and they tested it. Were any of those results positive? Well, as far as we know, no. So that means as of that time, nobody had it. At that exact point in time, no one had it. That's not to say patients didn't have it. Well, if they had it before, then they must have resolved without treatment? Is that even a thing? That is a thing. We have, from Dr. Vavas, our expert said that not testing it after inflammation makes it much less sensitive and more unlikely to detect. The American Society for Retinal Specialists says there are mild cases that can't be detected without FA. That's JA-448. So certainly there are cases where it would not have been detected. Because those don't lead to blindness? I mean, presumably if it leads to blindness, it's going to be detected. It may lead to blindness. It may resolve. It may be too mild. But the point is that the effective way to test for vasculitis is to test upon the appearance of symptoms. The American Society for Retinal Specialists says, after cases came to light, that even though defendants say there were no reported cases, they found it noteworthy that there was no defined protocol to test upon the appearance of symptoms. So you've moved now. You're using the terminology effective testing as opposed to no testing. The fact that there was not appropriate effective testing provides an inference that the protocol was not designed to detect. But all you're telling us is subsequently you have an expert who says they should have done something different, and maybe the medical group says they should have done something different. All of that happens once the cases are known. So to me, the only thing you have during the way they designed the study would have been Dr. Heyer's article about Bovee. That is the only thing, not after the cases are found, that you can point to that would suggest, well, the guy who designed their own study thought this wasn't the right way to do it. I think the three of them together certainly form a scientific consensus. But Dr. Heyer's article is very important because it's about Bovee, but it's right around the time where this protocol is getting started. It's a huge concern. And his article says, although it's about Bovee, that to detect retinal vasculitis, it's not enough just to have in the protocol these periodic tests, which is what happened in Bovee. And the red brief seems to say, well, it's a different kind of drug, it has different molecules, whatever. In your view, is that a response? Is that a responsive response? That's not a responsive response. Certainly there's a reasonable inference that this would have been sort of alarm bells for Dr. Francois and Apellas, that Bovee was this major thing that happened, and they didn't detect retinal vasculitis in that case. Dr. Heyer says, right, they didn't detect it, even though they tested with FA periodically in their protocol, because they didn't test upon the appearance of inflammation, which is what our expert says, which is what the Americans say. I guess what I don't understand about this case is it's basically, it is all out there. Any investor can look and see this is what they did, FA testing. This is what Dr. Francois is saying. And you can evaluate for yourself whether that FA testing, which is the right test, and you know the time horizons that they're doing it, then you can reach your own conclusion. And why is, what more information, what more needed to be said about the protocol than was said for some investor to make a reasonable estimate about what to make of Dr. Francois' statements? Given defendants' statement 13 times that there was no evidence of retinal vasculitis, and the majority of those... That was true. There was no... There were no reported cases, but that certainly, and the statement is made... This is an omission, right? You're going to tell us that's a half-truth, and the reason it's a half-truth is they were only testing at these, you know, non-correct times. Right. But we know that, but everyone knows that if they want to talk to somebody who's... Well, a reasonable investor doesn't have some scientific expertise, and a reasonable investor hearing that from defendants, especially when in those statements the majority of them, they're saying, we found evidence of inflammation, but basically don't worry, we don't have reported cases of retinal vasculitis, they would assume that they were testing for vasculitis, whether in the protocol or outside the protocol. And a reasonable investor... Well, I can't keep saying they weren't testing for it, but they were testing for it in the sense that this test would show it. You're saying they didn't test for it in the optimal way because they may get it right and hit the right time, but they may not, and that's your point, but I'm not sure that makes a lot. So, not just that they weren't doing it at the optimal time, but that there's a reasonable inference, which is all we need at the pleading stage, that the protocol was not designed to detect vasculitis. Why does it make any difference at all whether it was designed to detect vasculitis or diabetes? If, in fact, the test disclosed any vasculitis that occurred at the time of the test, then who cares about its design? Because, as all the experts say, that's not going to detect vasculitis in a large majority of cases. Sure, it's going to pick up some cases at those intervals. There are other cases that are just not going to get picked up. So now you're back to Judge Afram. Now you're talking about they didn't run that test enough. The fact that... Let's say they'd done that test every day for every participant throughout the whole thing, but it wasn't designed to look for, but it did look for, retinal vasculitis. Would you have a case? I think, well, they did it every day, probably not, but the fact that... Well, that would suggest that it was designed for it. I'm saying it wasn't. You talked to the person who called for the test. They were looking for something else. After all, this wasn't first out of the box here. There had been some prior studies done of this drug, and retinal vasculitis, as I understand it, was not showing up as an issue then. Our position is given. Vasculitis is not mentioned in the protocol. I would urge the Court to actually look at the protocol, and on page 30 of our opening brief we cite certain places where the fluorescein angiography is mentioned. It's all geared towards looking for this other condition, CNV. Did any study participant actually require treatment for retinal vasculitis? I'm sorry? Was there any study participant who required treatment for retinal vasculitis either during or after the exam? We don't know that. Do you know of any? I do not know of any. There were no reported cases, but, again, it's a misleading half-truth because without mentioning vasculitis in the protocol, the fact that it was not done upon the appearance of inflammation, there's a reasonable inference that they weren't looking for it. What proves this the answer of that? Along the way, they are doing the operative test. They are doing it at different periods, so the times, and then when someone leaves, 30 days thereafter. In that test, we'll show it, and we're looking at the test results, and we haven't seen it anywhere across the spectrum of people in our study. So you're saying they should have done something better, and maybe they should have, but what tells us that they made that statement with some evil intention or wrong intention? Or reckless intention. Yeah, or reckless intention. Or making the statement 13 times when they weren't looking for it. Well, but one out of 13, if they think it's right, they're going to keep saying it. So they think it's right. You think it's wrong. I guess I don't know what shows us that they kind of knew or were reckless that it was wrong. Well, one thing I want to say is that the other side talks about how this is just, and the district court, too, this is just a scientific dispute. There's nothing on the other side, there's nothing from any expert scientist, even from the FDA, suggesting that they were looking for retinal vasculitis. We're not challenging any scientific opinion. What we're saying is, and this is still going to the misleading part, that based on our allegations, there's a reasonable inference that they were not looking for vasculitis. And in terms of Sienter, you know, defendants. But you keep saying they weren't looking. What difference does it make that they weren't looking for it if they used a test that would detect it, looking or not? They happen to be using a test that would detect all kinds of things, but if. So then you're just talking about, again, the results of the test. It was the proper test to use. If there was retinal vasculitis, it would detect it. But your complaint is that they didn't use it enough. They didn't use it when it would have most revealed vasculitis at the time of inflammation, the time the symptoms arose, as opposed to just some random times. And that's what happened with B of U. They gave it in B of U. There was a clinical trial. They gave F.A. at periodic times. But this all hinges on your saying there were better times. And you have an expert, and you have these post statements that support that idea. But the reality is this still comes down to they did the test. They could see the result. The test protocol were published. Everyone knows what they're doing. This test was done, and it would show it. And they're telling you, based on all that, we didn't see it. Now, there are reasons to question it. But is that the same as they defrauded people? There's enough, we believe, that we have pled enough to show that they weren't looking for it. And Dr. Heyer, I think, his article, which comes right about that time, I think is really important. Because, again, what happened in B of U, they had a clinical trial. They were doing the F.A. periodically like they were doing in this case. But what the article is, it's a post hoc analysis of why retinal vasculitis was not discovered. And you talk about this protocol does one CNV, is that the condition?  And that condition was, in the earlier step one and step two studies for this drug, identified as a potential problem, correct? Yes. And in B of U, vasculitis had sort of the same provenance. It was viewed as a potential problem, right? So you sort of design your study to talk about the ones that are most problematic. But that doesn't mean you're blinding yourself to all of the rest of the information that you have. Well, I think the fact that they mentioned 13 times that there were no reported cases shows that this, too, was very important. And this was a critical condition, a side effect that they were very much concerned about. And if they were, it would have appeared, as CNV did, and they would have done F.A. on the appearance of symptoms like they did with CNV. And again, if the court would look at the protocol, and you can see, every reference to F.A. has to do with CNV or with screening criteria, which retinal vasculitis is not one of them. So yes, it was given, but it's clearly in that context. And Dr. Francois, there's no dispute that he would pay close attention to this, would have looked at the protocol and gone, wow, there's nothing in here about retinal vasculitis, there's nothing in here about testing upon the inflammation of symptoms, which I know from Dr. Heyer is critical. And having known that, then he would have, the incongruity between saying it 13 times and not being mentioned in the protocol would have been revealed. Is there any evidence in the record, medical evidence, that retinal vasculitis resolves on its own without treatment? There are two things. There is J.A. 448, the American Society for Retinal Specialists, talks about mild cases may not be detected without F.A. And then Dr. Vavas, our expert, who says at paragraph 65, this is J.A. 35, that significant delay decreases sensitivity of identifying the problems that have been treated or resolved through the passage of time. Who's the first person who said it at 448? That was the American Society of Retinal Specialists. So I guess, don't you need to have some suggestion that they know that what they're doing is going to miss resolved cases? I mean, those are all later. Well, Dr. Heyer. So it really does come down to Dr. Heyer. It comes down to Dr. Heyer as well as, you know, Dr. Francois being very aware of all the cases of inflammation, and he keeps linking, you know, these statements keep linking. Yes, there's inflammation, but no, don't worry, there's no retinal vasculitis. But they never test the inflammation to see if there's retinal vasculitis. That would be something that would be obvious to Dr. Francois. So what would they have had to say? Is your position they just could not have said there were no observed cases of retinal vasculitis or their disclosure of their protocols had to say something else for them to say that? They could have either said nothing about retinal vasculitis, or if they said we have no reported cases, they could have either said, but are protocols not designed to detect it, or they could have said what the American Society of Retinal Specialists said, which is no reported cases of vasculitis, but there's no defined protocol to test vasculitis upon the appearance of inflammation. If they said that, that would have been sufficient. Thank you. Thank you, counsel. At this time, would counsel for the appellees please introduce themselves on the record to begin? Good morning. Still good morning, Your Honor. May it please the Court. Peter Kolovos for the defendants, appellas, pharmaceuticals, and Dr. Cedric Francois. The Court can affirm the district court's decision on three separate grounds. The ground that the Court just spent the last 15 minutes discussing with counsel is the first. No falsity. The alleged omission here, there's no actionable misstatement or omission. The alleged omission here, which is that appellas' clinical trials were not designed to detect retinal vasculitis. That boils down to the question of whether, as the Court recognized, whether appellas was doing that test frequently enough at the right time. That is a question of scientific disagreement. It's not an actionable omission. Second, scienter. There are no adequate allegations here to support a strong inference of scienter. Plaintiffs acknowledge there's no direct evidence of scienter, no confidential witnesses, no internal documents, no government investigation, no restatement. There's also no motive allegations in this case, no stock trading. What plaintiffs have is circumstantial evidence. They try to articulate a core operations doctrine, but there are no underlying facts pled that were known to the company that would be a glaring incongruity within the meeting. I mean, it really boils back down to your scientific disagreement. If it really is a scientific disagreement, then you really can't fault them for saying things. But if it wasn't and they knew or their chief investigator knew that this wasn't the way to do it, then it seems different. That's right, Your Honor. And plaintiffs acknowledge in their briefing that scientific disagreement is not actionable. And they say they're not arguing about scientific disagreement, but they just spent 15 minutes arguing about whether the testing was timely or adequate as the basis for their claim. Could you construe them as saying that by saying that the test results found no retinal vasculitis, that implies that you used some test that was designed to get it, and that was false. Could you view their complaint that way? So I don't have to construe it. What about the enter if they knew that that testing procedure wasn't adequate? But I agree that that would be a way to establish the enter, but they haven't established that. They haven't alleged that anyone at the company – there are no allegations. And I'll get to Dr. Heyer in a moment. But there are no allegations that anyone at the company said we're not testing adequately for retinal vasculitis. There's no allegation that anyone at the company said this test isn't designed to do this. To the contrary, the record establishes that the company was conducting the test, everyone agrees, is the right test to detect retinal vasculitis. To Dr. Heyer for a moment. Dr. Heyer was the principal investigator for the clinical trials. There's no allegation that Dr. Heyer said to anyone at Appellus there's something wrong with this protocol. This protocol is not testing it frequently enough. This protocol is not adequate. Dr. Heyer's article about Biovu, which is a Novartis drug, wasn't talking about designing a clinical trial. Dr. Heyer's article is about this drug is now in the market. People are using it day in and day out. Here's what we, the authors of that article, including Dr. Heyer, recommend. Because Biovu at that time was known to cause retinal vasculitis. Not all drugs in this class cause retinal vasculitis. Most of them cause inflammation. But not all of them cause retinal vasculitis. What Heyer was saying in that article and his co-authors was we have a drug that's in the market that patients are actively using. We know it causes retinal vasculitis. So here's what we should do. If there's inflammation, look for retinal vasculitis. That isn't the case. You're saying it's all his opinion to do the things that he suggested, which is immediate testing for inflammation, was based upon prior knowledge that this was an at-risk drug for vasculitis? It was all because there were already known cases for Biovu, for Novartis' drug Biovu. That would explain why he wouldn't then focus on making sure that the study tested appropriately for retinal vasculitis. Because he didn't have that history of there being a problem. But then when they say something that implies that they did test for it more rigorously, then don't you have a problem? I don't believe so, Your Honor. And if you look at how plaintiffs – we get to this sort of semantic discussion of what does it mean to design for something or not design for something. But when you actually look at when the plaintiffs articulate, what was the omission? Or what did reasonable investors infer from the company's statements? They say the challenge statements – this is at page 20 of their opening brief – the challenge statements would lead a reasonable investor to understand that Apellis was adequately testing for vasculitis when it was not. Their brief at page 29, the same type of – quote, a reasonable investor would assume that the testing protocol included meaningful efforts to detect it. Now, if we take those alleged omissions and turn them into an affirmative representation – so if this was not an omission case, but the challenge statement were instead, we've seen no cases of retinal vasculitis in the clinical trials and we've been meaningfully testing for it or promptly testing for it or adequately testing for it. I don't think there would be no dispute from this side of the table that those are opinions. Those are statements of scientific opinion. Their expert may disagree with it, but that's not actionable. But their best point is your principal investigator, I think, says when you see inflammation, that's a precursor that could potentially be vasculitis, and so the way to discern that is to do an immediate FA. And so your guy who's designing your study says that, and then that's not what the study is, and then it's trumpeted that we didn't observe any cases, and they say, well, that's not worth anything, because their own guy says the right thing to do is test immediately. So what you omitted is what your guy would say is the best thing to do. That's their position. Well, that is their position. That Dr. Heyer's article was published in 2020, I believe it was, in the middle of these clinical studies. Again, the world knew. The protocols were public. The world knew what we were testing, what diagnostic tests we were doing, and when we were doing them. The trumpeted point, the 13 times, I don't know how many times counsel said 13 times, they try to create this impression that we were out there actively saying no retinal vasculitis and nothing else. I mean, I see why you would if this is a real scientific disagreement case. You wouldn't say it once. If you believed you were doing the right thing, you'd say it, and you'd say it, and you'd say it. I follow that. Go ahead. Well, but we weren't doing it. So these are some of the statements from the company's 10-Qs and 10-Ks. It is part of a summary of here's what's going on in the Phase III clinical trials. Here's when the clinical trials started. Here's how they're going. And then there's a paragraph that says so far in the clinical trials we've seen interocular information. We've seen other side effects. We have not seen cases of retinal vasculitis. So the trumpeting notion is a mischaracterization of the record. That isn't what the company was doing. These were updates to the market, to investors, and then also presentations at the American Society of Retinal Specialists. Some of the challenge statements are these PowerPoints that the company used at these presentations to doctors. And, again, there's multiple pages saying here's what's going on in the clinical trials so far. Here's the side effects we have seen. We have seen interocular information. We have seen other things. Those include descriptions that we're doing for fluorescein angiography at baseline, at 12 months, at 24 months, and within 30 days. And there's a bullet point that says haven't seen cases of retinal vasculitis. So that's not going out to the world and trumpeting. It is just part of the disclosure of here's what's going on in the trials. Suppose this were the exact same case, only instead of FA, they used as a test for retinal vasculitis litmus paper. And no one was found to have it. And they announced we didn't detect any retinal vasculitis. Would that be problematic? It might be. There may be a falsity problem, but there's no C-enter. So there would be C-enter in that instance. They would know the litmus paper is no good. Well, let's assume that litmus paper is not a valid test for retinal vasculitis. That's a safe assumption. But here, when you get to the question of C-enter, what was known to the company? Again, first, no allegation that anyone at the company said we don't think this is adequately testing for retinal vasculitis. By the way, the FDA approved these protocols, allowed the protocols. Does that tell us anything? It is not a get-out-of-jail-free card. But as this Court said, I believe it was Shash v. Biogen. I believe the phrase there was it's not a liability shield. But it certainly is undercutting the inference of C-enter that the company knew that it wasn't testing for vasculitis, which is what they're trying to show here, that the company knew that its test was adequate. Why would the FDA require there be testing for vasculitis? Because, again, these clinical trials are designed to demonstrate the efficacy and safety of a drug. They're actually not designed to find retinal vasculitis or not find retinal vasculitis. They're designed to see if this drug is safe and effective. But Stage 1 and Stage 2 of your drug didn't show any vasculitis, right? It did not. I guess my question is, would the FDA at Stage 3 require that the protocols have testing about vasculitis if it hadn't been found at the earlier stages? So the Biovu example is kind of where I would come back to here. The FDA also knew about Biovu. The FDA also knew. And, again, this is going to C-enter. If the FDA is also charged with making sure that these drug trials are safe and effective and no unexpected any potential side effects that might be known don't sort of crop up out of nowhere. Well, that could just mean the FDA didn't see testing for the retinal vasculitis as necessary. Right. And so that wouldn't exculpate a claim afterwards that implied you were looking for it. No, I think the more reasonable inference, I think the reasonable, the plausible inference, is the FDA was aware this class of drugs could cause retinal vasculitis, was aware that the company was conducting FA at the intervals that it was conducting. I mean, again, there's no dispute that the company was doing, in the protocols, and actually doing the testing that everyone recognizes is the right test to do retinal vasculitis. You mentioned the protocols were publicly available. There's some sort of difficult-to-apply law on when we can look outside the company's statements to resources that are in the market. What justifies us here placing any weight on the fact that investors, if they were really interested in this, knew what the protocols are, had access to know what the protocols were? So I don't believe plaintiffs are disagreeing that investors had access to the protocols and knew them. But I think the question is, it's not just investors. I mean, there are market participants who are following this drug, who are following this company. You don't need to be a medical expert to understand what test was being conducted and how frequently it was being conducted. I think in Carbonite, I think there was a, you know, you don't need to be a teacher. But you'd have to know something about, like, unresolved cases, or the cases might resolve themselves. I mean, right? I mean, that's how it all comes together. They're saying, obviously, if I went blind, I presume someone would know this happened to me and someone would look into it. So they're saying there are cases of vasculitis that happened and went away. But there's no well-pleaded allegations that there were cases that went away. And when you look what happened in the real world, first of all, the suggestion that patients might acquire. Well, you wouldn't know that. So basically what they say is to an expert entity, and our own experts said that can happen. Sure. The FDA said that can happen. That's not what happened in the real world. In the real world, there were cases of retinal vasculitis when this drug became commercialized. Those patients came forward. This is not a minor side effect, right? The symptoms of retinal vasculitis in the record are eye pain, blurred vision. These were patients who were in a clinical trial for a drug, for an eye drug. They were getting injections in their eye to get this drug. They're seeing the doctor every month, even if they're only every other month. They're seeing the doctor every month. It's not a credible allegation that a patient would have, just to finish the thought, wouldn't come forward and say, I've got blurry vision, I've got eye pain, and then just kind of quietly quit the study and not come forward. And in the real world, when the cases of retinal vasculitis were found, it's because people had pain and complications and went to their doctors and told them about it. But isn't there a better way for someone to get a mild case and it resolve on its own and never complain about it? That is one of Dr. Vavas' allegations, that there could be mild cases that could resolve themselves on their own. So don't we have to assume that's the case for pleading purposes? I mean, that could be the assumption. We also have to assume, though, that your clients knew that, because otherwise I guess you would think, well, it's going to have all of these other problems, and even if we missed it on our intermittent FA testing, someone's going to come forward. But for that to not be true, you'd have to know that there are these mild cases that just resolve themselves. Well, the allegation in the case here is that the company must have known because of the BOVU experience, because of the nature, and that's insufficient to establish a strong inference of CNTR, especially with all the other indicia that cut against CNTR. Again, the company disclosed not only disclosed its protocols, disclosed in its SEC filings. There could be side effects that are not seen in these clinical trials that could crop up, and as this Court, I believe it was in the, well, it might have been in Chash v. Byage, and that also undercuts the inference of CNTR when you make those informative disclosures. I'm sorry, the ocular case, which you think I would know because I was part of the team on that one. Thank you very much. Thank you, Your Honor. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a three-minute rebuttal. Andrew Love for appellants. This is not a case about scientific disagreements. We're not challenging any scientific opinions. It's a question of fact, whether or not defendants were seeking to discover retinal vasculitis in their protocol. Post and counsel talks about how these 13 statements were buried in SEC filings and presentations, but there's no question that these statements were very much material, that defendants were very concerned about the clinical trials and that the importance of retinal vasculitis in those trials. Analysts in press conferences at 70 Paragraph 167 noted... What is the inconsistency between I am testing, I'm doing tests, these are the tests, this test would find vasculitis, we didn't observe any, we're telling you when, so whether we announce we're looking for it, we're doing the test, we're reading the results, and we're telling you we didn't see any. And we're telling you the timing. What more do they need to say? Because detecting retinal vasculitis requires, from Dr. Heyer, from the American Retinal Society, and from our expert, testing upon the appearance of inflammation. And so reasonable investors hearing these statements would not understand that they weren't really looking for vasculitis. Again, the protocol, there's a number of tests, there's a number of conditions, retinal vasculitis isn't in there. And so I come back to the only way to prove they did that with some kind of scienter is because of Dr. Heyer. Because it can't be just what people say later. I mean, that just can't be. Well, certainly from Dr. Heyer. And I want to point out that defendants conceded below, which we pointed out in our opening brief, which they didn't contest, that defendants were aware of all the relevant facts. And so those facts, there's no dispute that that would have left Dr. Francois to pay very close attention to this issue. The materiality of the statements that, you know, vasculitis was a serious side effect, he was well aware of B of U, he was aware of the Dr. Heyer's article, those things are not in dispute. They've conceded it. The question is, Dr. Francois paying close attention, knowing about Dr. Heyer's article, looking at the protocol, he would see, well, it's not, vasculitis isn't mentioned here. It's not provided for in cases of inflammation. What's your response to what I think I'm going to summarize? But I think, look, look, we didn't see vasculitis in Stage 1 and Stage 2. We're at Stage 3. We're doing F.A. You know, Dr. Heyer says what he says about B of U, which had a really serious vasculitis problem, and what to do when you have a patient who has this. But that's not our situation. And so what we're doing is periodic testing that would show vasculitis, and we're reporting out the answer. Take it for what it is. They're doing the testing that may, by happenstance, find vasculitis. But given how important, because of B of U, finding a retinal vasculitis was and investor concern was about that issue, this was the same as with CNV, which had appeared in the earlier stages. This was a major issue for them. That's why they kept saying it over and over again, and they didn't test for it. Thank you.  Thank you, counsel. That concludes argument in this case.